IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BRIAN HOGUE,

               Petitioner,                      2: 08 - cv - 1056 - FCD TJB

    vs.

CALIFORNIA BOARD OF

PAROLE HEARINGS, et al.,

               Respondents.              <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

## I.  INTRODUCTION

Petitioner, Brian Hogue, is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of life imprisonment after pleading guilty to first degree murder with a firearm enhancement in 1977. Petitioner challenges the February 2007 decision by Governor Schwarzenegger reversing the October 2006 decision by the Board of Parole Hearings (the "Board") which had granted Petitioner parole.  Petitioner presents several claims in his petition; specifically:  (1) the Governor's reversal of Petitioner's parole release date was an abuse of discretion as there was no evidence to support the reversal ("Claim I"); (2) the Governor was without authority to revoke Petitioner's parole as his decision violates the Ex Post Facto Clause ("Claim II"); and (3) failure

1

of the Board to set a parole date violates Petitioner's due process and equal protection rights.  For

the foregoing reasons, Petitioner is entitled to federal habeas relief on Claim I.

## II.  FACTUAL[1] AND PROCEDURAL BACKGROUND

> On the evening of May 1, 1977, Brian Hogue shot and killed 61-year-old Fred Piperio.  Brian went to a bar, where he drank a few beers.  Armed with a loaded handgun, Brian demanded cash from Fred while Fred was counting money from the register.  Fred gave Brian cash.  Brian then instructed Fred to go into the bathroom and lie down.  Again, Fred complied.  At that point, Brian took out his gun and shot Fred in the back of the head, killing him.  Brian left the bar.

> Brian told a friend that he was going to the Redding Municipal Airport.  The friend informed police and Brian was arrested at the airport.  He had more than $1,000 in his possession.  Brian admitted to police that he robbed the victim and shot him in the back of the head.

> Mr. Hogue pled guilty to first-degree murder and was sentenced to life in prison plus a consecutive five-years-to-life sentence for using a firearm.

(Resp't's Answer, Ex. A at p. 97.)  In October 2006, the Board conducted a subsequent parole

consideration hearing.  The Board ultimately concluded that Petitioner was suitable for parole

and would not pose an unreasonable risk of danger to society or a threat to public safety if

released from prison.  In February 2007, the Governor reversed the Board's decision and found

that Petitioner would pose an unreasonable risk of danger to society if released at that time.

Petitioner challenged the Governor's decision in the County of Shasta Superior Court.

The Superior Court denied Petitioner's state habeas petition in a decision on October 20, 2007.

The California Court of Appeal, Third Appellate District summarily denied Petitioner's state

habeas petition on December 6, 2007.  The California Supreme Court summarily denied

Petitioner's state habeas petition on March 12, 2008.  Petitioner filed the instant federal habeas

---

[1] The factual background of the commitment offense is taken from the Governor's decision which reversed the Board's parole grant and is attached to Respondent's Answer at Ex. A.

1   petition in May 2008.

2                   III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

3          An application for writ of habeas corpus by a person in custody under judgment of a state

4   court can only be granted for violations of the Constitution or laws of the United States.  See 28

5   U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.

6   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

7   Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

8   and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

9   320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

10  decided on the merits in the state court proceedings unless the state court's adjudication of the

11  claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

12  clearly established federal law, as determined by the Supreme Court of the United States; or (2)

13  resulted in a decision that was based on an unreasonable determination of the facts in light of the

14  evidence presented in state court.  See 28 U.S.C. 2254(d).  Where a state court provides no

15  reasoning to support its conclusion, a federal habeas court independently reviews the record to

16  determine whether the state court was objectively unreasonable in its application of clearly

17  established federal law.  See Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009); see also

18  Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000), overruled on other grounds, Lockyer v.

19  Andrande, 538 U.S. 63 (2003).

20         As a threshold matter, this Court must "first decide what constitutes 'clearly established

21  Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at

22  71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under §

23  2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the

24  time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

25  application clause, a federal habeas court making the unreasonable application inquiry should ask

26  whether the state court's application of clearly established federal law was "objectively

3

1   unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

2   not issue the writ simply because the court concludes in its independent judgment that the

3   relevant state court decision applied clearly established federal law erroneously or incorrectly.

4   Rather, that application must also be unreasonable."  Id. at 411.  Although only Supreme Court

5   law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

6   determining whether a state court decision is an objectively unreasonable application of clearly

7   established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

8   the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

9   applied, we may look for guidance to circuit precedents.").

10           The first step in applying AEDPA's standards is to "identify the state court decision that

11  is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

12  When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the

13  last reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  The last

14  reasoned decision on the merits came from the County of Shasta Superior Court with respect to

15  Claims I and II.  With respect to Claim III, the California Supreme Court denied that Claim on

16  the merits without discussion.  Thus, with respect to Claim III the record will be independently

17  reviewed to determine whether the state court was objectively unreasonable in its application of

18  clearly established federal law.  See infra note 6.

19                              IV.  PETITIONER'S CLAIMS FOR REVIEW

20           A.  Claim I

21           In Claim I, Petitioner argues that the Governor's reliance on the circumstances

22  surrounding his commitment offense violated his due process rights.  The Due Process Clause of

23  the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or

24  property without due process of law.  A person alleging a due process violation must first

25  demonstrate that he or she was deprived of a protected liberty or property interest, and then show

26  that the procedures attendant upon the deprivation were not constitutionally sufficient.  See Ky.

4

1   Dep't of Corr. v. Thompson, 490 U.S. 454, 459-60 (1989).

2       A protected liberty interest may arise either from the Due Process Clause itself or from

3   state laws. See, e.g., Bd. of Pardons v. Allen, 482 U.S. 369, 373 (1987). The United States

4   Constitution does not, in and of itself, create a protected liberty interest in the receipt of a parole

5   date. See Jago v. Van Curen, 454 U.S. 14, 17-21 (1981). However, if a state's statutory parole

6   scheme uses mandatory language, it "'creates a presumption that parole release will be granted'

7   when or unless certain designated findings are made, and thereby giving rise to a constitutional

8   liberty interest." McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002) (quoting Greenholtz

9   v. Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 12 (1979)).

10      The full panoply of rights afforded a defendant in a criminal proceeding is not

11  constitutionally mandated in the context of a parole proceeding. See Pedro v. Or. Parole Bd., 825

12  F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme Court has held that a parole board's

13  procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a

14  decision informing him of the reasons he did not qualify for parole. See Greenholtz, 442 U.S. at

15  16.

16      As a matter of state law, denial of parole to California inmates must be supported by at

17  least "some evidence" demonstrating current dangerousness. See Hayward v. Marshall, 603 F.3d

18  546, 562-63 (9th Cir. 2010) (en banc) (citations omitted). "California's 'some evidence'

19  requirement is a component of the liberty interest created by the parole system of the state."

20  Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010). Thus, a reviewing court such as this one

21  must "decide whether the California judicial decision approving the governor's decision rejecting

22  parole was an 'unreasonable application' of the California 'some evidence' requirement or was it

23  'based on an unreasonable determination of the facts in light of the evidence.'"[2] Hayward, 603

24

25          [2] To the extent that the Respondent argues that Petitioner's Claims are not cognizable on
    federal habeas review under AEDPA or that Petitioner does not have a federally protected
26  interest in parole, the Ninth Circuit has specifically held that "due process challenges to

5

1  F.3d at 562-63.

2        The analysis of whether some evidence supports denial of parole to a California state

3  inmate is framed by the state's statutes and regulations governing parole suitability

4  determinations.  See Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007), overruled in part on other

5  grounds, Hayward, 603 F.3d 546.  This court "must look to California law to determine the

6  findings that are necessary to deem a prisoner unsuitable for parole, and then must review the

7  record to determine whether the state court decision holding that these findings were supported

8  by 'some evidence' . . . constituted an unreasonable application of the 'some evidence'

9  principle."  Id.

10        California Penal Code section 3041 sets forth the state's legislative standards for

11  determining parole for life-sentenced prisoners.  Section 3041(a) provides that, ""[o]ne year prior

12  to the inmate's minimum eligible release date a panel . . .  shall again meet with the inmate and

13  shall normally set a parole release date."  Cal. Penal Code § 3041(a).  However, subsection (b)

14  states an exception to the regular and early setting of a life-sentenced prisoner's term, if the

15  Board determines "that the gravity of the current convicted offense or offenses, or the timing and

16  gravity of current or past convicted offense or offenses, is such that the consideration of public

17  safety requires a more lengthy period of incarceration for this individual."  Cal. Penal Code §

18  3041(b).

19        As previously stated, Petitioner committed the murder on May 1, 1977.  Thus, the

20  relevant section of the California regulations with respect Petitioner's parole suitability on his

21  first degree murder conviction is 15 Cal. Code Regs. § 2281.[3]

22  _____

23  California courts' application of the 'some evidence' requirement are cognizable on federal
   habeas review under AEDPA," and that "California's 'some evidence' requirement is a
24  component of the liberty interest created by the parole system of that state."  Cooke, 606 F.3d at
   1213 (citing Hayward, 603 F.3d at 561-64).

25

26        [3] Petitioner cites to 15 Cal. Code Regs. § 2402 in support of Claim I.  However, Section
   2402 applies "to prisoners sentenced to prison for first and second degree murders committed on

Title 15, Section 2281 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for life prisoners.  The Board is directed to consider all relevant, reliable information available regarding:

> the circumstances of the prisoner's:  social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

15 Cal. Code Regs. § 2281(b).  The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole.  Id. § 2281(c)-(d).[4]  The overriding concern is

_____

or after November 8, 1978 and attempted murders where the perpetrator is sentenced for life pursuant to the provisions of Penal Code Section 664." 15 Cal. Code Regs. § 2400.  The relevant regulation for this first-degree murder committed in 1977 is 15 Cal. Code Regs. § 2281. However, 2281 and § 2402 are identical.  See In re Lawrence, 44 Cal. 4th 1181, 1201 n.5, 82 Cal. Rptr. 3d 169, 190 P.3d 535 (2008) (explaining that § 2281 is identical to § 2402).

[4] Circumstances tending to indicate unsuitability include:

> (1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:
>> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution style murder.
>> (C) The victim was abused, defiled or mutilated during or after the offense.
>> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
> (2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
> (3) Unstable social history.  The prisoner has a history of unstable or tumultuous relationships with others.
> (4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
> (5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

7

public safety and the focus is on the inmate's *current* dangerousness.  See In re Lawrence, 44 Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  Thus, the proper articulation of the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that the inmate's release would unreasonably endanger public safety.  See In re Shaputis, 44 Cal. 4th 1241, 1254, 82 Cal. Rptr. 3d 213, 190 P.3d 573 2008).  There must be a nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  In re Lawrence, 44 Cal. 4th at 1227, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  As to the circumstances of the commitment offense, the Lawrence court concluded that while:

//

---

> (6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

15 Cal. Code Regs. § 2281(c).

> Circumstances tending to indicate suitability include:

>> (1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
>> (2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.
>> (3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving the suffering of the victim, or indicating that he understands the nature and magnitude of the offense.
>> (4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.
>> (5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.
>> (6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.
>> (7) Age.  The prisoner's present age reduces the probability of recidivism.
>> (8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
>> (9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

Id. § 2281(d).

8

> the Board and the Governor may rely upon the aggravated
> circumstances of the commitment offense as a basis for a decision
> denying parole, the aggravated nature of the crime does not in and
> of itself provide some evidence of current dangerousness to the
> public unless the record also establishes that something in the
> prisoner's pre- or post-incarceration history, or his current
> demeanor or mental state, indicates that the implications regarding
> the prisoner's dangerousness that derive from his or her
> commission of the commitment offense remain probative to the
> statutory determination of a continuing threat to public safety.

Id. at 1214, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

                    i. 2006 Board decision

The panel of the Board that presided over Petitioner's 2006 parole suitability hearing

considered the factors bearing on Petitioner's suitability for parole and weighed those factors in

favor of releasing Petitioner on parole.  The Board stated the following in deciding to grant

parole:

> the Panel has reviewed all information received from the public
> and relied on the following circumstances in concluding that you
> are suitable for parole and would not pose an unreasonable risk of
> danger to society or a threat to public safety if released from
> prison.  The prisoner has a stable social history, or did have, as
> exhibited by reasonably stable relationships with others, including
> his early life and his military service.  While in prison, he has
> enhanced his ability to function within the law upon release
> through participation in educational programs, self-help and
> therapy, vocational programs, institutional job assignments, and
> others . . . .
>
> I note that you have upgraded your skills, both educationally since
> you've been here.  You obtained your GED in 1984 and you have
> also taken comp classes through your support culture at Solano
> Community College.  You note for the record that you have 60
> hours, took a 50-hour course in metal press machine . . . . It was
> obtained October 2002, and I do have a certificate available.  This
> is in metal fab, and it's called the "Certificate for Completing the
> 60-Hour Course for Punch with a Major in [Amava Pega].  And
> it's [sic] talks about programming.  We also note that you are
> skilled as Marvel, and it's Marvel saw.  You got that certification
> January 11, 2006.  You also have comp, a certificate from both
> landscaping or horticulture, which you took from 1987 to 1990.
> We note that you have worked in metal fab, the record seems to
> suggest in 1999, and they note you have exceptional work ethics.  I
> also note prior to that that you worked in the institution as an

inspector for pest control.  You worked with maintenance and food service.  There is an indication in here that at one point, the institution was under a major audit.  They had no certified vector control person technician employed at the institution.  And since you were a certified vector control technician, and your expertise, diligence, knowledge and driving attitude enabled you to be an asset in that area where you were assigned, took control of the whole operation with little or no supervision and that the institution passed the audit successfully.  And there is documentation filed to that effect.

There is also a letter from a correctional officer that worked with you, Robinson, PIA, while you were in the metal shop as a tool attendant.  She documented that there were hundreds of tools that you were responsible for, and that you handled your duties with ease and efficiency.  It looks like you and the correctional officer developed a positive working relationship, and she states that you were . . . always reliable and open about communication regarding all aspects of tool room reliability and dependability.

There is also sentiments of the same from your general fabrication superintendent, Mr. Ahalt, from the Metal Machine Shop at that time as well.  I also note that you are also a certified forklift operator, and that you have participated via correspondence courses, and you've participated in FEMA, Federal Emergency Management Agency.  And you have various certifications in emergency preparedness that you've taken over the years.  The overall certificate is dated July 19, 2004, and I note that there are various competencies related to that trade:  effective communication, decision making and problem-solving.  There's a Certificate of Achievement for a Citizen's Guide to Disaster Assistance, Hazardous Materials: a Citizen's Orientation, Radiological Emergency Management, and Emergency Preparedness.  Some of these were done in 2002, an Emergency Program Manager, an orientation to the position.  Many of these were initially taken in 2002, and you went back and renewed the training program in 2004.

In reference to self-help, which is of most interest and which is very important to this Panel, it helps that you've been involved in AA for quite some time.  I note that your participation in self-help goes back quite a ways, to the '70s, when you participate in Cap X, Cap T, category T programs, that included one-on-one therapy through counseling.  I have documentation.  I tried to get a sense of who you were as I just sampled things all through the years.  I note that you had individual therapy, you were dropped from that program on August 22 after being involved for five months, saying that you had done well in the program.  Internship termination says a therapist:  "Hogue has been in therapy since 3-28-79.  He has attended sessions regularly and made significant progress in dealing with his low self-concept through utilization and

10

assertiveness and rational behavior training.  Continued session with another therapist is recommended."

So I note that you are going through a number of different types of programs.  There is a problem saying of 7-9-1979 saying that you were a member of the Executive Council in the Peer Counseling Program and that you held the position of executive treasurer.  In that program, Dr. Pope, says that:  "You demonstrated the ability to lead as a leader of the Peer Council Program by successfully completing fundamentals of transactional analysis through self-guided imagery, CARTA, Communication Model, assertive training techniques of small group leadership structure and dynamic domestics of instruction, which complete the fundamental phase of the counseling program.  Inmate Hogue has shown his ability to work with a caring attitude while instructing in a group setting."

So I did that just to show samples – those were in the '70s.  I also note you were involved in AA and NA for an extended period of time.  You stopped at one point, according to the record, it says, to start a lawsuit, or work with a lawsuit.  You were challenging the will of your father.  The Commission talked to you in another panel about that.  It says you re-enrolled as you continued to work on the White Bison Neighborhood Substance Abuse program.  When I look at your work through the '80s, I have a sample of your work supervisor's report.  And at that time you were the clerk for the associated superintendent at CTF Central.  And he said at that time – and this is a promulgated 4-1-1983:  "that your job was "clerical, typing, filing, recordkeeping.  Hogue is doing and continues to do an exceptional job regarding clerical duties in the associated superintendent's clerk position.  He has good attitude, is cooperative, continues to assume more responsibility as needed.  He has no problem getting along with fellow inmates and staff."  And that's signed by Rose Ackerman.

The '90s, I looked, you continued to do well.  Your book horticultural instructor, Robert C. McCann . . . states:  "continue to display good understanding of horticultural and is an aid in teaching other students.  He possesses adequate knowledge and motivation for entry level employment as a greenhouse worker, landscape maintenance worker or pesticide applicator."  So there's quite a bit about your work ethic.  You seemed to be consistent over the decades.

We do note that in 2003, when the Panel talked to you, you were trying to start the White Bison Native American substance abuse program.  We note that program has now been started, it has a sponsor.  And we just put on file earlier when you showed us a certificate, the "Redwood Valley Rancheria Red Road Program, the Certificate of Complaint to Mr. Brian Hogue."  And this certified that you had taken 24 hours of training in the Red Road

Talking Circle and training and prevention of substance abuse using native American Medicine will.  The training was done at the California State Prison-Solana, August 8, 2005 through August 22, 2005 and August 29, 2005.  So it appears that you have immersed yourself into self-help programs.  I note that you've also contributed when you were at BDI scholarship program.  It appears to this Panel that you have been a positive asset to each prison that you've worked in.  Your attitude has been consistent.  You've been a hard worker, and immersed yourself in self-help since way back in the '70s. . . .

Sir, you committed a crime as a result of significant stress in your life.  You were under the influence of alcohol and meth amphetamine, and we went into great detail on record about your past following substance abuse.  And you have admitted that freely and discussed it and discussed the tools that you have obtained to deal with that in the future.  We submit that the influence of both alcohol and meth amphetamine are widely unknown [sic] in terms of criminality.  You also lack significant criminal history of violent crime.  Because of maturation, growth, greater understanding, and advanced stage you have a reduced probability of recidivism.  In fact, you are a 54-year old male who presents as a mature man who understands the nature and gravity of his offense.  In fact, this Panel is impressed by your leadership position in group activities throughout your history of incarceration, and most particularly, you have grown in leadership roles as you have continued to program.  The Panel also feels you have realistic parole plans that include a job offer and family support, and noting that in fact you have made a very mature decision to parole to the Three Rivers Indian Lodge Drug and Alcohol Residential Treatment program and have been accepted as such for their 90-day program.  And this program has been presented as a documented program with details as to the program itself and the assistance that will be provided in employment.  You also provided employment plans.  You do have a job offer.  Actually, it appears that you have multiple job offers, and they are realistic and consistent with your experience such that they should be very successful.  You also have realistic parole plans that include your family support, and you have a wife of longstanding who continues to support you and has provided her letter of support.  She currently lives out of state and you very wisely have made interim plans to be basically the transition program and then would hopefully make a home with your wife.

You have maintained positive institutional behavior that indicates significant improvement in self-control from your commitment offense, and you have a good record of only two CBC 115s, the last occurring on May 14, 1982, which was for destruction of state property and you were charged $16 for the destruction of four window panes.  And prior to that you had the only other 115, which was on March 3, 1978, for obeying [sic] orders for which you were confined one weekend to quarters.  And you have no

12

128A.  So that is significant.

You also show signs of remorse, and you've done so historically with the psychologist, and you did so here today, indicating that you understand the nature and magnitude of the offense and accept responsibility for the criminal behavior and have a desire to change towards good citizenship.

You've presented here today with a credible and appropriate and calm demeanor, and also the Panel feels it should be noted that you've clearly stayed the course after the previous grant was rejected by the Governor in 2004, and you redoubled your efforts with positive programming, which was a very mature reaction. And in fact, in responding to the Governor's letter of rejection, the Governor did not in his letter of 2004, that's January 12, 2004, "that Mr. Hogue has been incarcerated for approximately 26 years and seems to be model prisoner."  Now, of course, you have been incarcerated for 28 years.  And to quote the Governor's letter, "He has not had any disciplinary problems for more than 20 years."  He cites to your prior programming and then he mentions AA and NA. He says, "You have participated in numerous self-help and therapy programs," and he points to your above average to excellent work ratings in a variety of institutional jobs.  He also notes, and we would like to underscore that you donate to an institutional scholarship fund, which the Panel indicates that you are thinking not only of yourself any longer but of others and that you have represented your stay.  You are clearly trying to assist young men who come into the institution from following in your steps, and you have not been too prideful or too ashamed to actually describe what your crime is and what you have suffered as an example, a very positive example of how these young men should not recidivate and what they should do if they do.  Also, it's to be underscored as a leader in White Bison Native American program in getting established.  It is now a recognized program, which is a valid substitute for participation in the AA/NA type Christian-based program.  And you've discussed it in some detail today. You were able to articulate the step-type program and how you actually use it as a tool in your own life.

The Governor's letter stated that you have expressed remorse through your crime, and the Governor states that he believes that you were generally [sic] sorry.  This Panel also believes that you were genuinely sorry and that you have expressed that today and you have expressed it with a great deal of maturity.  The Governor cites a concern that as recently in 1994 you still could not explain why you killed Mr. Tuscario, and we feel that you indeed have explained it in some detail today and that you have for a significant period of time, and that you do have insight into this terrible crime. This letter of the Governor states that you would be living with your wife and receive transportation to and from work by her, and we indicate that there has been a change of parole plans, which are

13

actually significantly better, and we have articulated those changes. As to job plans, the Governor was encouraged that you actively sought employment, and so are we. He cited a concern as to whether your plans were realistic. We feel that they are realistic. You have found actual job potential that employees will feel that you have obtained in presence. And then the Governor also cites concerns about participation in AA and says that recently your participation has lapsed. We do not find that to be the case; in actuality you have been placed in programs that we feel gives particularly you, your background more substantive support than AA and NA. It is a 12-step program as such and gives you full support. And you have also articulated how that would be a supportive reference when you are paroled. This Panel feels that indeed, contrary to the Governor's prior letter that you actually do not pose a significant risk to the public or a threat to public safety at this time, and we feel that you have shown that you do not, by your deeds and actions.

Now, as to the psychological reports, the most recent psychological report was authored by Nancy Van Couvering . . . in March 30, 2006. And Van Couvering indicates that, "The causative factors were alcohol, meth amphetamine, intoxication. Impulsive violence is one of the hallmarks of meth amphetamine abuse." And she points out that, "He clearly understood his responsibilities even though intoxicated and that he did express remorse for the crime to the doctor," as you have done here today.

As to your prior criminal history, this Clinic indicates that you did not have a juvenile history of any significance in your first brushes with the law, or at about age 24 for substance abuse. As to estimated dangerousness in the community for significant risk factors, the clinician says, "This inmate is well aware of the catastrophic impact of substance abuse on his life and on the life of his victim. He's been active in the recovery programs and has been a prime mover in establishing the White Bison program in this prison. It is an AA/NA type program designed specifically for native Americans." And then she cites, "The view of previous evaluators seems appropriate, and I concur that estimated future violence in the community is low." And then moving back to the immediately prior report, which is actually an interim corrective addendum done on June 13, 2003 by Dr. Mary Young, staff psychologist. This actually states that – basically it's an attempt to clarify what was requested prior and wishing for a full assessment, it's not clear at this time what this addendum accomplishes. It does mention your mother's passing now two years prior to this report and your father's immediately prior to this report as of one year. You also had an uncle who passed away two years prior to this 2003 report, and it mentions that your sole remaining support system is an aunt and your wife, and says you have not talked to your brother or sister in over 15 years. Basically today, you have shown how you have grown out of that experience of those deaths

14

and missing support systems, that you have in place a very solid support system and you definitely have the support system as read into the record, including of your wife.

So moving back to the July 2003 – actually, a lifer (sic) calendar psychological report, which was actually created on May 22, 2003. This was written by Dr. Mary Young, also a staff psychologist. We'd like to just point out that it's a similar report to the latest report, but does all out [sic] the Axis V global assessment of functioning of '90, indicating good function in all areas of domain. And for the record, a GAS of 90 shows that you're absent from minimal symptom, i.e., a mild anxiety such as before examination. You have good functioning in all areas. You're interested and involved in a wide range of activities. You're socially effective. You're generally satisfied with life. You have no more than everyday problems or concerns, such as an occasional argument with family members. And this clinician indicated that you have no treatment at present and do not have a need for any. And this clinician also supported parole in saying that, "The inmate is mature and emotionally stable at this time. He poses as low risk of dangerousness should he be paroled, and is prepared to contribute vocationally. The inmate has excellent work skills obtained in prison. He has completed self-help group, psychotherapy and has no remaining health issues. He is a regular participant in AA, and of course that was in 2003, and a respected member of the AA community." And I should interject that in fact you were a member of AA/NA for over 20 years, and very active, I might note. As noted earlier, at this time the Commission refers to your hopes of establishing the White Bison chapter, which of course you did. Also, it represents that you have a strong social support system family, and clearly you also have a strong native support system as well. We also note that in opposition to finding of parole suitability was the city of Redding Police Department and the District Attorney of Shasta County.

As to the numbers, noting that this inmate is not released until the Governor exercises his review authority in granting your parole, we calculated the base time in prison as 216 months. Now, let me explain the derivation of that. This offense occurred on May 1, 1977. The term is derived from the matrix located in the California Code of Regulations, Title 15 of Section 2282B, first-degree murder committed on or before November 7, 1978. In fact, the Panel finds that Category 3C is appropriate in that there was no prior relationship between Mr. Hogue . . . and the victim in this case. Since the victim died of severe trauma, he was shot to death. The Panel assesses 216 months for the base offense, noting that this is an aggravated term. And the reason for the aggravation circumstances leading to aggravation are first, that the victim is particularly vulnerable due to age, as well as the fact that he was closing up his bar at the time of the crime. And during commission of the crime, the prisoner had a clear opportunity to

15

secede, but instead continued.  He could have robbed the victim and left, but did not.  Additionally, the murder was apparently senseless in that it was committed after the robbery occurred and served no purpose in completing that crime; thus, the reasons for aggravating the term.  There are no other offenses for which to add time except for the use of a firearm; and that is Code Section 12.225 of the same case number 577657, count number one, use of a firearm, and we assess 24 months for that.  Therefore, the base life term is 216 months, 24 months added for the weapon, bring a total to 240 months.  And post-conviction credits are awarded from the date the life term began; that is, September 24, 1980 to today's date, October 14, 2006 [sic].  And we assess four months per year minus those years which you have any disciplinarians, and that came to a total of 96 months of time credit, giving a total of 144 months to serve.

Also, we're imposing special conditions of parole:  Do not use alcoholic beverages, submit to alcohol testing, submit to anti-narcotic testing, submit to PHP testing, and participate in a substance abuse program such as AA, NA or a bonified [sic] Native American program, and attend parole outpatient clinic.  And the reasons for imposition of the special conditions are the nature of the commitment offense, the nature and circumstances actually, of the commitment offense.  If this decision is final, you will get a parole date.  The Board will send you a copy of the decision.  And if the officer here will give you a copy of the decision.  Do not break any rules in the California Code of Regulations, Title LVI, Section 2451.  If you break any rules your release date may be changed or taken away.  And sir, I will tell you what we tell all inmates to whom we give a grant.  I'm sure you've been told this before.  But once you've received a grant, you become a target.  And so you know to hold your counsel at your own discretion.  There are people who would like to take that date away who would be jealous of it.  And so you just need to basically watch your back and I'm glad you're smiling because you can now.  I certainly wish the best of luck to you sir, and I certainly hope that if this goes through I think you will be an asset to the community.

(Resp't's Answer, Ex. A at p. 73-90.)

ii. 2007 Governor's Decision

As previously stated, the Governor reversed the Board's decision.  The governor may review the Board's parole decision and is authorized to reverse or modify it, applying the same standards as the Board.  See Cal. Const. art. V, § 8(b), Cal. Penal Code § 3041.2.  Although the governor undertakes an independent, *de novo* review of an inmate's suitability for parole, his decision must be based on the same statutory factors and the same evidentiary record that was

16

before the Board.  See In re Rosenkrantz, 29 Cal. 4th 616, 660-61, 128 Cal. Rptr. 2d 104, 59 P.3d

174 (2002).  The governor has discretion to weigh the suitability factors differently than the

Board and may choose to be more stringent or cautious in determining whether an inmate poses

an unreasonable risk to public safety.  See In re Shaputis, 44 Cal. 4th at 1258, 82 Cal. Rptr. 3d

213, 190 P.3d 573.  The governor's decision must still reflect due consideration of the specified

factors as applied to the individual prisoner in accordance with applicable legal standards, and

must be supported by some evidence in the record.  See In re Lawrence, 44 Cal. 4th at 1204, 82

Cal. Rptr. 3d 169, 190 P.3d 535.

After reciting a summary of Petitioner's commitment offense, Governor Schwarzenegger

stated the following:

> When he committed the murder, Mr. Hogue was 25 years old.  His juvenile adjudications include auto theft and being a runaway and his adult criminal history includes convictions for intoxication and brandishing a weapon.
>
> I have considered various positive factors in reviewing whether Mr. Hogue is suitable for parole at this time.  As I noted in my 2004 decision reversing the Board, Mr. Hogue has remained disciplinary free since 1982.  He earned a GED, and passed a state-certified licensing test for pest control.  He also completed vocational training in Landscape Care.  Mr. Hogue held several institutional jobs, earning certification in both the metal punch and metal saw.  In addition, he participated in an array of self-help and therapy, including Alcoholics Anonymous, Narcotics Anonymous, the White Bison Neighborhood Substance Abuse Program and the Red Road Talking Circle.  He is a FEMA volunteer and has earned various certificates for disaster preparedness.  Mr. Hogue received positive psychological reports and above-average to excellent work ratings in a variety of institutional jobs.  He maintains a solid relationship with his wife, who lives in Missouri.
>
> The 2006 Board determined that Mr. Hogue has realistic parole plans.  They ordered that Mr. Hogue parole to San Joaquin County, despite having a last legal residence in Shasta County.  Mr. Hogue plans to live at the Three Rivers Indian Lodge, located in San Joaquin County.  However, the Board's Investigation Unit noted that Mr. Hogue may be put on the lodge's waiting list pending verification of his Native American ancestry.  The 2006 Board also determined that Mr. Hogue secured employment at a residential painting company in Vacaville.  Mr. Hogue's goal is to eventually live with his wife in Missouri and pursue a career in metal

1         fabrication or pest control.

2         Despite the positive factors I considered, the first-degree murder
Mr. Hogue committed was especially grave because he committed

3         an execution-style killing in a dispassionate and calculated manner.
Mr. Hogue had an opportunity to avoid the killing; he could have

4         stopped after stealing the money or after directing the victim to lie
on the ground.  Instead, he shot the vulnerable victim in the back of

5         his head.  There is also evidence that Mr. Hogue's motive for the
murder was trivial in relation to the severity of the offense.

6         Initially he told the 2006 Board that the robbery served as a motive
for killing Mr. Piperio.  He then told the Board that he did not have

7         a motive for killing Mr. Piperio, saying that it "was a chance of
opportunity."  Under the circumstances, the gravity of the first-

8         degree murder committed by Mr. Hogue is sufficient for me to
conclude presently that his release from prison would pose an

9         unreasonable public-safety risk.

10        In finding Mr. Hogue suitable for parole, the 2006 Board said that
he "committed the crime as a result of significant stress," noting

11        that Mr. Hogue was under the influence of both crank and alcohol
when he killed Mr. Piperio.  But even if Mr. Hogue was

12        experiencing stress, I do not presently believe that this factor, by
itself, sufficiently mitigates the severity of the crime he committed.

13

14        I note that the Redding Police Department opposed parole at the
2006 Board Hearing based on the gravity of the crime.  The Shasta

15        County District Attorney's office also opposed parole, asserting
that Mr. Hogue still poses an unreasonable risk to public safety.

16        At age 55 now, after being incarcerated for more than 29 years, Mr.
Hogue has made some credible gains in prison, including accepting

17        responsibility for his actions and expressing remorse.  But given
the current record before me, and after considering the very same

18        factors that the Board must consider, I find that the gravity of the
first-degree murder committed by Mr. Hogue outweighs the

19        positive factors.  Accordingly, because I believe his release would
pose an unreasonable risk of danger to society at this time, I

20        REVERSE the Board's 2006 decision to grant parole to Mr.
Hogue.

21 (Resp't's Answer, Ex. A at p. 97-98.)

22        iii.  Superior Court Decision

23      On state habeas review, the County of Shasta Superior Court denied Petitioner's state

24 habeas petition.  With respect to Petitioner's claim that the Governor's decision was arbitrary and

25 capricious and that there was no evidence to support the reversal of the Board's decision, that

26 court stated:

[Petitioner] argues that the murder was not especially heinous, atrocious or cruel.  He points out that his crime was much less egregious than those in other cases.  However, that is not the standard.

> Accordingly, we conclude that the Board, exercising its traditional broad discretion may protect public safety *in each discrete case* by considering the dangerous implications of a life-maximum prisoner's crime individually.  While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release.  The BPT acts properly in determining unsuitability, and the inmate receives all constitutional process due, if the Board provides the requisite procedural rights, applies relevant standards, and renders a decision supported by some evidence.

In re Dannenberg (2005) 34 Cal.4th 1061, 1071 (emphasis in original).

". . . the Governor may overturn a grant of parole on any basis the Board could have used to deny it."  (In re Dannenberg, supra at 1070).

The primary consideration in denying parole is whether the "gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses is such that consideration of the public safety requires a more lengthy period of incarceration. . ." (Penal Code section 3041(b)).

In reviewing the Governor's decision, the court must "view the record in the light most favorable to that determination."  (In Re Morrall (2002) 102 Cal.App.4th 280, 301).  Denial of parole by the Governor is subject to judicial review only to determine if the decision was supported by "some evidence" and that the requirements of procedural due process were followed.  (In Re Rosenkrantz (2002 ) 29 Cal.4th 616).  "As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision."  (Rosenkrantz, supra at 677).

The Governor took into consideration all of the factors establishing suitability for parole (petitioner's accomplishments in prison) and weighed them against the factors establishing non-suitability

(execution-style murder and motive being inexplicable).  Thus, Petitioner was afforded the due consideration the law requires.

(Resp't's Answer, Ex. B at p. 4.)

    iv.  Analysis of Claim I

   In Claim I, Petitioner first argues that the Governor was arbitrary and capricious when he found that the commitment offense was especially grave.  However, the record supports that there was some evidence for this specific finding by the Governor.  For example, the record included evidence that Petitioner committed the murder in an especially dispassionate and calculated manner in an execution style.  See Cal. Penal Code § 2281(c)(1)(B).  Petitioner first robbed the victim and then ordered him to lie down whereupon Petitioner shot the victim in the back of the head execution style.  The record also supported the Governor's finding that the motive for the crime was trivial.  See Cal. Penal Code § 2281(c)(1)(E).  These circumstances were properly analyzed and considered by the Governor in determining whether the commitment offense was carried out in an especially heinous or cruel manner.  As such, Petitioner's argument that the Governor's findings lacked some evidence with respect to the circumstances of the commitment offense do not warrant federal habeas relief.

   Within Claim I, Petitioner also argues that the Governor solely based his decision to reverse the Board on the immutable circumstances surrounding the commitment offense.  In its answer, the Respondent admits that "[t]he Governor denied parole based solely upon the basis of Hogue's crime."  (Resp't's Answer at p. 2.)  As previously noted, the Governor cannot rely solely on the commitment offense as a basis to deny parole absent some evidence of current dangerousness.  See In re Lawrence, 44 Cal. 4th at 1214, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  In resolving a federal habeas claim that the governor's denial of parole was not based on "some evidence" courts "need only decide whether the California judicial decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'"  Hayward, 603 F.3d at 562-63.

Here, the Superior Court found that the Governor complied with due process because he

determined that the execution-style murder and the trivial motive for the commitment offense

outweighed all of the positive factors supporting Petitioner's parole.  (See Resp't's Answer,

Exhibit B at p. 4.)

The Governor specifically mentioned numerous positive factors that supported

Petitioner's parole eligibility.  For example, the Governor noted that Petitioner had remained

disciplinary free in prison since 1982, a period of twenty-five years.  The Governor stated that

Petitioner earned a GED and held several skilled jobs while imprisoned.  Additionally, the

Governor explained that Petitioner participated in an array of self-help groups and had received

positive psychological evaluations.  The Governor also found that Petitioner had realistic parole

plans.[5]  The Governor further stated Petitioner had accepted responsibility for his actions and

expressed remorse for his crime.

The Governor also recited the Board's finding that Petitioner committed the crime as a

result of significant stress.  The finding that a prisoner committed the crime as a result of

significant stress in his life is a circumstance tending to show suitability for parole.  See 15 Cal.

Code Regs. § 2281(d)(4).  While the Governor's decision did not reject this finding *per se*, he

concluded that it was outweighed by the sole factor he determined supported Petitioner's

unsuitability for parole, namely the severity of the commitment offense.

Even though the Governor highlighted all of these positive factors supporting Petitioner's

parole eligibility, the Governor determined that the circumstances surrounding the commitment

offense outweighed all of the positive factors as did the Superior Court in rejecting Petitioner's

state habeas petition.  (See Resp't's Answer, Ex. A at p. 98 ("I find that the gravity of the first-

---

[5] The Governor stated that there was some question as to whether Petitioner would be accepted into the Three Rivers Indian Lodge.  However, during the hearing before the Board, the Board read into the record a letter from the Three Rivers Indian Lodge which stated that Petitioner was accepted into its 90-day residential treatment program.  (See Resp't's Answer, Ex. A at p. 63-64.)

degree murder committed by Mr. Hogue outweighs the positive factors."); id. at Ex. B at p. 4

(explaining that the Governor took all of Petitioner's positive factors supporting parole against

the factors establishing non-suitability, i.e. the circumstances of the commitment offense which

were an execution style murder and an inexplicable motive for the murder.)

The commitment offense occurred in May 1977; thus, almost thirty years passed from the

time Petitioner committed the crime to when the Governor made his decision in February 2007.

The California Supreme Court has held that in cases:

> in which evidence of the inmate's rehabilitation and suitability for
> parole under the governing statutes and regulations is
> overwhelming, the only evidence related to unsuitability is the
> gravity of the commitment offense, and that offense is both
> temporally remote and mitigated by circumstances indicating the
> conduct is unlikely to recur, the immutable circumstance that the
> commitment offense involved aggravated conduct does not provide
> "some evidence" *inevitably* supporting the ultimate decision that
> the inmate remains a threat to public safety.

In re Lawrence, 44 Cal. 4th at 1191, 82 Cal. Rptr. 3d 169, 190 P.3d 535 (emphasis in original);

see also Cooke, 606 F.3d at 1214 (finding California's "some evidence" rule requires "more than

the crime or its circumstances alone to justify the Board's or Governor's finding of current

dangerousness").

In In re Lawrence, the California Supreme Court determined that a commitment offense

which occurred over thirty years prior to the Governor's denial of parole was no longer probative

of the petitioner's current dangerousness.  That court found that the intervening years had

rendered "the unchanging factor of the gravity of petitioner's commitment offense" no longer

probative of current dangerousness and therefore could not constitute some evidence.  See In re

Lawrence, 44 Cal. 4th at 1226, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  Similar to the inmate in In re

Lawrence, the intervening three decades between the circumstances of Petitioner's commitment

offense and the Governor's decision, as well as Petitioner's extensive rehabilitative efforts render

the circumstances of the commitment offense no longer probative of Petitioner's current

dangerousness by themselves.  See, e.g., Cooke, 606 F.3d at 1214; see also Barber v. Hartnet,

Civ. No. 10-402, 2010 WL 4568986, at *12-13 (E.D. Cal. Nov. 3, 2010) (intervening twenty-six years between circumstances of commitment offense and parole hearing rendered the commitment offense no longer probative of current dangerousness where Petitioner was twenty-six years old when he committed the offense and was now fifty-five years old); Sabados v. Sisto, Civ. No. 08-1210, 2010 WL 3521933, at *7 (E.D. Cal. Sept. 8, 2010) ("It is possible that a decision based solely on the gravity of a 25 year old commitment offense could be considered arbitrary to the extent that the offense may longer be probative to an assessment of the inmate's current future dangerousness, particularly where there also exists strong evidence of rehabilitation."); Perez v. Hartley, Civ. No. 08-1665, 2010 WL 2546107, at *8 (E.D. Cal. June 18, 2010) (finding that intervening twenty-four years between commitment offense and parole hearing and petitioner's extensive rehabilitative efforts rendered circumstances of commitment offense no longer probative of current dangerousness), report and recommendation adopted by, 2010 WL 3521967 (E.D. Cal. Aug. 13, 2010); Deville v. Kramer, Civ. No. 08-1294, 2010 WL 2491023, at *7 (E.D. Cal. June 16, 2010) ("A decision based solely on the gravity of a commitment offense that occurred 18 years prior could be arbitrary if it no longer held any probative value to an assessment of the inmate's current or future dangerousness."); Jackson v. Haviland, Civ. No. 09-989, 2010 WL 2011598, at *5 (E.D. Cal. May 12, 2010) (stating that "[a] decision based solely on the gravity of a 30 year old commitment offense could potentially be arbitrary to the extent that the offense might no longer be probative to an assessment of the inmate's current or future dangerousness where there is strong evidence of rehabilitation" but concluding that the Board's decision was not arbitrary as it cited additional, non-historical factors to support its conclusion that the petitioner sill posed an unreasonable risk of danger); Tash v. Curry, Civ. No. 05-2417, 2008 WL 3984597, at *12 (N.D. Cal. Aug. 27, 2008) ("In light of the extensive evidence of Petitioner's in-prison rehabilitation and exemplary behavior, the reliance on the unchanging facts of the murder to deny Petitioner parole for the tenth time - twenty-two years into his minimum seventeen year sentence - violated his right to due process."); Brown v.

1  Kane, Civ. No. 05-5188, 2007 WL 1288448, at *6 (N.D. Cal. May 2, 2007) ("Brown's lengthy

2  detention has diminished the probative value of his commitment offense."); Masoner v. State,

3  Civ. No. 03-1261, 2004 WL 1080177, at *1 (C.D. Cal. Jan. 23, 2004) (granting habeas petition

4  where inmate had exemplary record, extensive self-improvement including participation in AA

5  as well as group and individual therapy such that the Board's continued reliance on pre-

6  conviction factors to justify its refusal to grant inmate a parole date violated Petitioner's due

7  process rights).   Here, Petitioner's due process rights were violated under these specific facts

8  when the Governor denied (and the Superior Court approved of) Petitioner's unsuitability for

9  parole based solely on the circumstances surrounding the thirty-year old commitment offense.

10        As previously stated, the Board determined that Petitioner lacked significant criminal

11  history of violent crime.   In his decision reversing the Board, the Governor recited Petitioner's

12  prior criminal history.   He did not disagree with the Board's finding that Petitioner lacked

13  significant criminal history of violent crime.   Instead, the Governor noted that Petitioner's prior

14  criminal history included auto theft as a juvenile and brandishing a weapon as an adult.   While

15  not cited by the Governor in his decision, the Board read into the record a letter from the Chief of

16  Police of the City of Redding during the 2006 hearing which stated that "the evening prior to

17  arriving in Redding, Hogue used the same stolen weapon he killed Mr. Tuscario with to rob a

18  convenient store located in Weed, California."   (Pet'r's Pet. at p. 71.)

19        The Governor did not state any nexus or reasoning as to how Petitioner's prior criminal

20  history established some evidence that Petitioner poses a current threat to the public if released

21  on parole.   The Governor may not simply list relevant parole factors; rather, he must set forth his

22  reasoning that establishes a rational nexus between a parole factor and the determination of

23  current dangerousness.   See In re Lawrence, 44 Cal. 4th at 1210, 82 Cal. Rptr. 3d 169, 190 P.3d

24  535 ("'[D]ue consideration' of the specified factors requires more than rote recitation of the

25  relevant factors with no reasoning establishing a rational nexus between those factors and the

26  necessary basis for the ultimate decision – the determination of current dangerousness.").   Just as

1  "mere recitation of the circumstances of the commitment offense, absent articulation of a rational

2  nexus between those facts and current dangerousness, fails to provide the required 'modicum of

3  evidence of unsuitability,'" see id. at 1227, 82 Cal. Rptr. 3d 169, 190 P.3d 535, mere recitation of

4  Petitioner's pre-incarceration record fails to provide the required modicum of evidence of

5  Petitioner's current dangerousness.  See Lujan v. Curry, Civ. Nos. 08-474, 09-462, 2010 WL

6  3743658, at *12 (N.D. Cal. Sept. 17, 2010) (citing In re Lawrence, 44 Cal. 4th at 1227, 82 Cal.

7  Rptr. 3d 169, 190 P.3d 535); Sanders v. Watson, Civ. No. 08-1499, 2010 WL 2816324 (E.D.

8  Cal. July 15, 2010).  Federal courts "cannot reweigh the factors supporting parole suitability and

9  the factors supporting parole unsuitability."  See Powell v. Gomez, 33 F.3d 39, 42 (9th Cir. 1994)

10  ("This court cannot reweigh the evidence, but looks only [for] 'some evidence.').  Here, the

11  Governor did not weigh the Petitioner's prior history as an unsuitable factor.

12       Nevertheless, under the relevant California regulations, a previous record of violence is a

13  relevant parole unsuitability factor.  See 15 Cal. Code Regs. § 2281(c)(2).  Here, the intervening

14  period of thirty years or more since Petitioner committed his prior crimes has also lessened the

15  probative value of how Petitioner's prior history relates to Petitioner's current dangerousness.

16  For example, at the 2006 hearing, the Board asked the Petitioner about his conviction for

17  brandishing a weapon.  Petitioner stated that, "I was drinking, got in a fight.  He pulled a knife, I

18  pulled a knife.  And that was the end of the fight.  I got arrested, plead [sic] guilty, and doing

19  weekends in County jail."  (Resp't's Answer, Ex. A at p. 45.)  Since Petitioner committed that

20  crime, the record shows that Petitioner has participated in extensive self-help programming in the

21  form of decades worth of treatment including participation in Alcoholics and Narcotics

22  Anonymous and similar self-help and treatment programs.

23       In light of the fact that:  (1) the Governor only recited Petitioner's prior criminal history;

24  (2) the Governor did not attempt to nor did he create a nexus between Petitioner's prior criminal

25  history to his current dangerousness; and (3) Petitioner's prior criminal history is an immutable

26  factor temporally remote under these facts to create a nexus that Petitioner remains currently

1  dangerous in light of Petitioner's extensive rehabilitative efforts which includes decades worth of

2  participation in programs such as AA, NA and similar type self-help; Petitioner's prior criminal

3  history does not establish "some evidence" of Petitioner's current dangerousness under these

4  specific facts and the relevant law.  See, e.g., Lewis v. Schwarzenegger, Civ. No. 07-2465, 2010

5  WL 3448570, at *2, 8 (N.D. Cal. Aug. 31, 2010) (determining that Governor's reliance on the

6  immutable facts of the commitment offense (first-degree murder) and his prior criminal history

7  which included two convictions of battery as a juvenile and convictions as an adult of statutory

8  rape, bank robberies and possession of narcotics could no longer constitute evidence of present

9  danger where the petitioner had been imprisoned for twenty-seven years for the commitment

10  offense); Dyer v. Clark, Civ. No. 08-1881, 2010 WL 2991482, at *6 (E.D. Cal. July 28, 2010)

11  (explaining that where Board relied on pre-incarceration criminal history which included

12  arrests/convictions for robbery, grand theft and driving under the influence in denying parole to

13  an inmate convicted of second-degree murder that "[t]he last misconduct occurred almost

14  eighteen years prior to the parole hearing.  There is nothing in the record to suggest that these

15  prior incidents of criminal misconduct remain relevant toward the inquiry of whether Petitioner is

16  currently dangerous."); Sanders, 2010 WL 2816324, at *7 (stating that the petitioner's prior

17  record included arrests or convictions of grant theft auto, possession of narcotics, robbery,

18  receiving stolen property and burglary but that the Board's reliance on this immutable factor was

19  erroneous as it failed to articulate a rational nexus why petitioner's prior history continued to be

20  probative of petitioner's current dangerousness); Cowans v. Marshall, Civ. No. 05-6276, 2009

21  WL 2824579, at *11 (C.D. Cal. Aug. 25, 2009) (where petitioner had quite a few

22  arrests/convictions including assault with a deadly weapon reduced to battery and carrying a

23  firearm, "the Board did not explain . . . how this . . . adult record of misdemeanor convictions, or

24  past history of drug use was in any way probative of Petitioner's risk of danger to society nearly

25  thirty years after the commitment offense.  The fact that Petitioner had prior petty theft and

26  burglary convictions prior to turning eighteen, misdemeanor brushes with the law prior to turning

26

twenty-one, and a history of substance abuse prior to incarceration, is not probative of his current dangerousness thirty years later, given the uncontroverted evidence of Petitioner's rehabilitation in prison."), aff'd by, No. 09-56880, 2010 WL 2931132 (9th Cir. July 22, 2010); Slater v. Sullivan, Civ. No. 08-571, 2009 WL 2244189, at *10 (E.D. Cal. July 27, 2009) (noting that petitioner's prior criminal history related to his use of drugs but that petitioner had participated in self-help programming and had not used drugs in the intervening twenty year period and that reliance on two immutable factors of prior criminal history and the circumstances of the commitment offense are not probative of petitioner's current dangerousness), aff'd by, No. 09-17784, 2010 WL 4117080 (9th Cir. Oct. 20, 2010); Saldate v. Adams, 573 F. Supp. 2d 1303, 1312 (E.D. Cal. 2008) (explaining that the considerations that the Board relied on were past unchanging factors that were not recent including conduct that Petitioner committed as a juvenile and failing to see how the past conduct supported a finding that Petitioner currently posed a risk of danger to society in light of Petitioner's conduct from 1990 onwards) (citing In re Roderick, 154 Cal. App. 4th 242, 277, 65 Cal. Rptr. 3d 16 (2007)); Trunzo v. Ornoski, Civ. No. 05-734, 2008 WL 703770, at *17 (N.D. Cal. Mar. 13, 2008) ("[T]he board's reliance on the nature of the commitment offense and the unchanging factor of Trunzo's criminal record [which included possession of drugs and auto burglary] to deny him parole at his April 2003 hearing violated his federal due process rights" as "the Board's continued reliance on these immutable factors effectively converts Trunzo's sentence of life with possibility of parole into life without the possibility of parole, which violates Trunzo's liberty interest in parole."); McCullough v. Kane, Civ. No. 05-2207, 2007 WL 1593227, at *9 (N.D. Cal. June 1, 2007) ("In light of the extensive evidence of McCullough's in-prison rehabilitation and exemplary behavior, the reliance on the unchanging facts of the murder and his juvenile criminality [which included assaultive and violent conduct] to deny him parole 21 years into his 15-to-life sentence violated his right to due process."); In re Juarez, 182 Cal. App. 4th 1316, 1345, 106 Cal. Rptr. 3d 648 (2010) ("It is apparent from the evidence and the presiding commissioner's recitation that Juarez's prior

1  criminal history does not have any probative value regarding his current dangerousness.

2  According to the probation department, Juarez was involved in six incidents from 1977 to 1981,

3  when he was about 18 to 22 years of age, which led to various misdemeanor convictions.  Two of

4  these six incidents involved substance abuse, Juarez told the Board he was drunk during a third,

5  and the record indicates that he tested positive for PCP repeatedly while on probation during part

6  of this time.  While the incidents were not without violence, including his firing of a gun on one

7  occasion and his punching of a woman on another, they tend to be similar in nature, for the most

8  part involving reckless behavior under the influence of an impairing substance and belligerent

9  behavior when confronted by police.  They do not demonstrate an escalating pattern of criminal

10  behavior or a significant history of violent crime.  Rather, they demonstrate, as the probation

11  department concluded in 1982, the dangers of a reckless, relatively young alcoholic and drug

12  addict getting behind the wheel of a car.  There is not a rational nexus between this prior criminal

13  history and Juarez's current dangerousness.").

14       In many of the cases cited above, the Board or Governor attempted to rely upon the

15  inmate's prior criminal history in determining that the inmate was unsuitable for parole.  This

16  case is even at least one step removed from those cases as the Governor did not even rely on

17  Petitioner's prior criminal history in finding him unsuitable for parole.

18       In conclusion, almost thirty years elapsed between Petitioner's commitment offense and

19  the Governor's decision denying parole.  The use of immutable factors, such as the aggravating

20  circumstances of the commitment offense to deny parole were no longer probative of Petitioner's

21  current dangerousness.  The intervening thirty years and Petitioner's extensive rehabilitation

22  efforts as expressed by the Board in supra Part IV.A.i and the Governor in supra Part IV.A.ii

23  lessened the impact of the immutable factors such that they were no longer probative of

24  Petitioner's current dangerousness.  The Governor did not relate other immutable factors (such as

25  Petitioner's prior criminal history) to his current dangerousness.  See, e.g., In re Lazor, 172 Cal.

26  App. 4th 1185, 1203, 92 Cal. Rptr. 3d 36 (2009) ("[T]he Board's decision identified immutable

1  factors . . . but it did not expressly rely upon petitioner's lack of insight or ability to conform his

2  behavior to the law upon release and failed to relate the identified immutable factors to

3  circumstances that would make them probative of petitioner's current dangerousness . . . .

4  Immutable facts, may be relied upon but must be related to the ultimate determination of current

5  dangerousness.").  For the foregoing reasons, the Superior Court decision constituted an

6  unreasonable application of clearly established federal law.  The Governor's reversal of the

7  Board's grant of parole did not comport with due process because it was not supported by some

8  evidence of Petitioner's current dangerousness.  Therefore, Petitioner is entitled to federal habeas

9  relief on Claim I.

10             v.  Remedy for Claim I

11         In its answer, Respondent argues that Petitioner is not entitled to release and states that

12 "[t]he remedy is limited to the process that is due, which is a new review comporting with due

13 process."  (Resp't's Answer at p. 3.)  Respondent cites to Benny v. United States Parole

14 Commission, 298 F.3d 977, 984-85 (9th Cir. 2002) in support of its contention.  The Ninth

15 Circuit has rejected this argument.  See Pirtle v. Cal. Bd. of Prison Terms, 611 F.3d 1015, 1025

16 (9th Cir. 2010) ("Ordering the release of a prisoner is well within the range of remedies available

17 to federal habeas courts.").

18         More recent cases decided by the Ninth Circuit and the California Supreme Court do not

19 foreclose a court's ability to release Petitioner under these circumstances.  In Haggard v. Curry,

20 623 F.3d 1035, 1038 (9th Cir. 2010), the Ninth Circuit reviewed a motion by the state to stay the

21 release of an inmate pending appeal.  Ultimately, the Ninth Circuit granted the stay and held that,

22 "where the *Board's* parole denial decision is not based on 'some evidence' of current

23 dangerousness, the California-created, but federally enforceable, liberty interest in parole gives

24 the prisoner only the right to a redetermination by the Board consistent with the state's 'some

25 evidence' requirement, not the right to release on parole."  Id. at 1042 (emphasis added).  In

26 reaching this conclusion on the motion to stay pending appeal, the Ninth Circuit relied on the

1 California Supreme Court's decision in <u>In re Prather</u>, 50 Cal. 4th 238, 112 Cal. Rptr. 3d 291, 234

2 P.3d 541 (2010).

3       In <u>In re Prather</u>, 50 Cal. 4th at 244, 112 Cal. Rptr. 3d 291, 234 P.3d 541, the California

4 Supreme Court considered "the limited procedural question of the proper scope of the decision of

5 a reviewing court that concludes the Board has abused its discretion in denying a prisoner a

6 parole date."  The court was quick to note that its decisions in <u>In re Lawrence</u> and <u>In re Shaputis</u>

7 "addressed the *Governor's* reversal of a grant of parole by the Board, and did not determine the

8 proper remedy when a reviewing court grants a petition for writ of habeas corpus on the basis

9 that the Board's decision to deny parole was not supported by some evidence of current

10 dangerousness."  <u>Id.</u> at 252, 112 Cal. Rptr. 3d 291, 234 P.3d 541 (emphasis added).  In <u>In re</u>

11 <u>Lawrence</u>, the California Supreme Court affirmed the Court of Appeal's decision which vacated

12 the Governor's reversal and reinstated the Board's grant of parole to the petitioner.  Thus, as this

13 case involves a decision by the Governor, as opposed to the Board that was at issue in <u>Haggard</u>

14 and <u>In re Prather</u>, the proper remedy is releasing Petitioner pursuant to the Board's October 2006

15 decision.

16       B.  Claim II

17       While Petitioner is entitled to federal habeas relief on Claim I, Petitioner's remaining

18 claims will be analyzed as well for purposes of completeness.  In Claim II, Petitioner argues that

19 his right under the Ex Post Facto Clause of the Constitution was violated because his suitability

20 for parole was determined under the DSL (Determinate Sentencing Law) rather than the ISL

21 (Indeterminate Sentencing Law).  The Ninth Circuit has determined that the Ex Post Facto

22 Clause is not violated when a defendant sentenced under California's ISL is denied parole under

23 DSL parole suitability guidelines.  <u>See</u> <u>Connor v. Estelle</u>, 981 F.2d 1032, 1033-35 (9th Cir. 1992)

24 (per curiam).  In <u>Connor</u>, the Ninth Circuit stated that, "[w]e agree with the California courts that

25 have considered the issue and hold that the application of the DSL parole-suitability guidelines to

26 prisoners sentenced under the ISL does not disadvantage them, and therefore does not violate the

1    federal constitutional prohibition against ex post facto laws." 981 F.2d at 1033-34. Thus,

2    Petitioner is not entitled to federal habeas relief on Claim II.

3         Reading the petition liberally, Petitioner also appears to argue that the Governor's review

4    of the Board's grant violated the Ex Post Facto clause since the Governor did not have such

5    authority at the time of Petitioner's offense. In a factually similar case to the case at bar, the

6    Ninth Circuit rejected an argument by a petitioner that the California Governor's reversal of the

7    Board's decision granting parole violated the Ex Post Facto Clause. See Johnson v. Gomez, 92

8    F.3d 964 (9th Cir. 1996). Ultimately, the Ninth Circuit found as follows:

> In this case, Johnson is similarly unable to demonstrate that an
> increase in his punishment actually occurred, because, like the
> petitioner in Morales, he had not been granted parole under the old
> law. Under the old law, BPT's decision would have been subject
> to no review. Johnson's case is like Dobbert [v. Florida 432 U.S.
> 282 (1977)], where the petitioner could only speculate whether the
> jury would have imposed a life sentence had it possessed the final
> power to decide. Here, because the BPT's parole decision is not
> final until after the expiration of the thirty-day gubernatorial review
> period, it cannot be said with certainty that the BPT would have
> granted Johnson parole had it possessed final review authority.
> Johnson argues that, unlike the administrative convenience purpose
> of the law in Morales, the purpose and effect of the law here is to
> lengthen prison terms by making it more difficult for convicted
> murderers with indeterminate sentences to be released on parole.
> However, the law itself is neutral inasmuch as it gives the governor
> power to either affirm or reverse a BPT's granting or denial of
> parole. Moreover, the governor must use the same criteria as the
> BPT. The law, therefore, simply removes final parole
> decisionmaking authority from the BPT and places it in the hands
> of the governor. We cannot materially distinguish this change in
> the law from that at issue in Mallet v. North Carolina, 181 U.S.
> [589,] at 590, 21 S.Ct. [730,] at 731. In Mallet, the Court found no
> ex post facto violation where the new law allowed for higher court
> review of intermediate court decisions, even though the petitioner
> would have been entitled to a final intermediate court decision at
> the time of his crime. We therefore conclude that the application
> of Proposition 89 to authorize the governor's review of Johnson's
> grant of parole did not violate the Ex Post Facto Clause.

24   Id. at 967 (internal citations omitted).

25        Petitioner's arguments are similar to those that were rejected in Johnson. The Governor's

26   review is based on the same criteria and record used by the Board. The additional layer of review

is neutral and does not, it and of itself, increase Petitioner's punishment.  Petitioner is not entitled

to federal habeas relief on Claim II.

C.  Claim III[6]

Finally, in Claim III, Petitioner alleges that "the Board failed to comply to California

Penal Code § 1170.2 and § 3041(c)."  (Pet'r's Pet. at p. 23.)  Specifically, Petitioner argues that

he should have been before the Board no later than October 1, 1978 and have had a parole release

date set at that time.  First, to the extent that Petitioner bases this Claim under state law, it is not

cognizable on federal habeas review.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (stating

that it is not the province of a habeas court to examine state law questions).  However, Petitioner

also alludes to his equal protection and due process rights within this Claim.  The ISL and DSL

schemes both require that a prisoner be found suitable for parole before a parole date can be set.

See In re Stanworth, 33 Cal. 3d 176, 183, 187 Cal. Rptr. 783, 654 P.2d 1311 (1982) ("Under both

the 1976 and the current rules, a life prisoner must first be found suitable for parole before a

parole date is set.").  Furthermore, as previously stated, the ISL and DSL schemes both use the

same criteria for determining whether a prisoner was suitable for parole.  See Connor, 981 F.2d

at 1033-34.  Petitioner has not shown that he was discriminated against based on his membership

in a protected class, see Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001), or that

similarly situated individuals were treated differently without a rational relationship to a

legitimate state purpose.  Cf. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

---

[6]  In its answer, Respondent asserts that the only claim in which Petitioner exhausted his
state court remedies was his "claim that the Governor's decision violated his due process
rights."(Resp't's Answer at p. 2.)  However, Petitioner clearly raised Claims II and III to the
California Supreme Court.  (See Resp't's Answer, Ex. E at p. 17-24.)  Furthermore, even though
the Superior Court denied Claim III on procedural grounds, as previously noted, the California
Supreme Court summarily denied Petitioner's habeas petition.  This type of "postcard" denial is
construed as a decision on the merits.  See Gatson v. Palmer, 417 F.3d 1030, 1038 (9th Cir.
2005), modified on other grounds, 447 F.3d 1165 (9th Cir. 2006); see also id. at 1036 ("[T]he
California Constitution provides that each of the three levels of state courts - Superior Court,
Courts of Appeal, and the Supreme Court - has original jurisdiction in habeas proceedings.")
(internal quotation marks and citation omitted).

1  Petitioner's claims with respect to Claim III are without merit and do not warrant federal habeas

2  relief.

3                                              V.  CONCLUSION

4          The state court's determination that some evidence supported the parole reversal by the

5  Governor was an objectively unreasonable application of clearly established federal law in light

6  of the evidence presented and constituted a violation of Petitioner's due process rights as the

7  Governor's decision lacked "some evidence" of Petitioner's current dangerousness.

8          For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

9      1.       Petitioner's application for writ of habeas corpus be GRANTED with respect to

10              Claim I; and

11     2.       Respondent be directed to release Petitioner from custody, within 10 days after

12              any order adopting these findings and recommendations, in accordance with the

13              October 4, 2006 decision of the Board finding Petitioner suitable for parole.

14         These findings and recommendations are submitted to the United States District Judge

15  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

16  after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

19  shall be served and filed within seven days after service of the objections.  The parties are

20  advised that failure to file objections within the specified time may waive the right to appeal the

21  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22  DATED:  December 13, 2010

23

24

25  _____

26                    TIMOTHY J BOMMER
                      UNITED STATES MAGISTRATE JUDGE

                                              33